**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| IRAKLI KVARATSKHELIA, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Case No. CIV-26-01673-JD |
| | ) | |
| TODD BLANCHE, et al., | ) | |
| | ) | |
| Respondents. | ) | |

# **ORDER**

Before the Court is Petitioner Irakli Kvaratskhelia's Petition for Writ of Habeas Corpus under 28 U.S.C. § 2241 [Doc. No. 1]. Respondents filed a Response [Doc. No. 7],[1] and Petitioner filed a Reply [Doc. No. 8].[2]

---

[1] Citations to the parties' filings use ECF designations from the top of district court filings for both page numbers and exhibit numbers. As the Petition's exhibits are consolidated in a single submission, all references to the Petition's exhibits consist of the page number within "[Doc. No. 1-1]."

[2] Since filing his Reply, Petitioner has filed a motion to expedite [Doc. No. 9], a notice of supplemental authority [Doc. No. 10], and two supplements to the motion to expedite docketed as distinct motions [Doc. Nos. 11, 12]. The Court has considered these filings, and they do not alter the Court's analysis or conclusions. Although Petitioner's September 16, 2026, supplement reports that the immigration judge granted Petitioner asylum and withholding of removal, DHS has reserved appeal, and the appeal deadline is October 15, 2026. [Doc. No. 12-1 at 4]. The decision is therefore not yet final, and the proceedings remain pending. *See* 8 C.F.R. § 1003.39. Other district courts granting a bond hearing under these circumstances (that is, notwithstanding an unexpired DHS appeal deadline), have done so on the basis of a prolonged detention finding inapplicable here and which itself relies on a due process theory the Court rejects below. *See, e.g.*, *Ali X v. Bondi*, No. 26-cv-01367-STV, 2026 WL 1857825, at *4 (D. Colo. June 29, 2026). However, should the factual circumstances outlined in this Petition change following DHS's appeal deadline (e.g., DHS does not appeal but continues to detain him), nothing in this Order would preclude Petitioner from filing a new § 2241 petition.

Petitioner contends that his humanitarian parole and subsequent residence in the United States entitle him to a bond hearing under 8 U.S.C. § 1226(a). But his parole left his request for admission unresolved. Section 1182(d)(5)(A) directed his return to custody when parole ended, and § 1225(b) requires detention during the admission proceeding documented here. Petitioner's challenges to parole termination and his separate constitutional claim do not establish a right to release or to a custody redetermination hearing. For the reasons below, the Court denies the Petition.

## I. BACKGROUND

Petitioner is a citizen of Georgia who arrived at John F. Kennedy International Airport on October 7, 2022. [Doc. No. 8 at 3]. Immigration officials permitted him to enter the country on humanitarian parole. [Doc. No. 1 ¶¶ 21–22]. His original Form I-94 records parole through October 5, 2024. [Doc. No. 1-1 at 15]. The U.S. Citizenship and Immigration Services ("USCIS") later extended parole through October 5, 2026. *Id.* at 12. Both documents identify his parole class as UHP.[3]

During his parole, Petitioner lived with his wife and children, worked, and paid taxes. Petitioner says he complied with all reporting requirements and that he has no criminal history. [Doc. No. 1 ¶¶ 5, 23–28]. He further points out that his wife has medical needs and that she depends on him for financial support and caregiving. *Id.* ¶¶ 5, 25–28.

---

[3] UHP refers to Ukrainian Humanitarian Parole. Although Petitioner is Georgian, his USCIS records expressly identify his application as part of Uniting for Ukraine. [Doc. No. 1-1 at 16, 21].

On June 17, 2026, Oklahoma officers stopped Petitioner, and ICE took him into immigration custody. *Id.* ¶¶ 30–31; [Doc. No. 7-2 at 1]. Petitioner alleges that he showed the officers his unexpired parole documents and received no written notice terminating parole before his arrest. [Doc. No. 1 ¶¶ 30–31, 39].

The Notice to Appear ("NTA") classifies Petitioner as an arriving alien and charges him with inadmissibility under § 1182(a)(7)(A)(i)(I) for lacking the required entry documents. An "Assistant Field Office Director" signed the NTA and its continuation page, which is dated June 17, 2026. [Doc. No. 7-1 at 1, 4]. The NTA directs Petitioner to appear in removal proceedings under 8 U.S.C. § 1229a.[4] *Id.* at 1. The certificate of service shows service on June 18, 2026. *Id.* at 3. On July 8, 2026, an immigration judge denied Petitioner's motion to terminate those proceedings, concluding that parole had terminated no later than issuance of the NTA. [Doc. No. 7-4 at 1–2].

Petitioner filed this action on July 2, 2026,[5] while detained at Diamondback Correctional Facility in Watonga, Oklahoma. [Doc. No. 1 ¶¶ 1, 9, 12]. He seeks release or an individualized custody hearing at which Respondents must prove danger or flight risk by clear and convincing evidence. *Id.* ¶ 6. He also requests an order preventing transfer outside this District while this case is pending and requiring notice and a hearing before any future redetention. *Id.* at 20–21.

---

[4] Section 240 of the Immigration and Nationality Act is codified at 8 U.S.C. § 1229a.

[5] It was docketed and entered by the Clerk's Office on July 5, 2026.

## II. LEGAL STANDARD

The writ of habeas corpus is available to those held "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c)(3). And § 2241(c)(3) generally gives district courts jurisdiction over challenges to the legality of an alien's detention. *Rasul v. Bush*, 542 U.S. 466, 483–84 (2004); *see also Soberanes v. Comfort*, 388 F.3d 1305, 1310 (10th Cir. 2004) ("Challenges to immigration detention are properly brought directly through habeas.").

## III. ANALYSIS

The parties disagree about what follows from Petitioner's arrival in the United States and his subsequent humanitarian parole. Respondents argue (1) that he sought admission at a port of entry without a required immigrant visa, (2) that humanitarian parole did not admit him to the country, and (3) that as of the termination of his humanitarian parole, he remains subject to mandatory detention as an arriving alien. [Doc. No. 7 at 1–4]. Petitioner generally responds that the Government (1) authorized his travel, (2) permitted him to enter after inspection, and (3) repeatedly approved his presence here. Petitioner argues that, as an individual who has lived in the country lawfully for years, he is no longer seeking admission at the border. [Doc. No. 1 ¶ 41]; [Doc. No. 8 at 2–5, 12–14].

The Court proceeds to examine (1) the legal impact of Petitioner's grant of humanitarian parole on his request for admission; (2) whether § 1225(b) mandates Petitioner's detention; (3) whether deficits in termination notice timing and a lack of changed circumstances impair the Government's ability to detain Petitioner; and (4)

whether Petitioner's no-bond detention violates the Due Process Clause of the Fifth Amendment.

### A. Petitioner's humanitarian parole did not cancel his request for admission.

Admission ordinarily means "the lawful entry of the alien into the United States after inspection and authorization by an immigration officer." 8 U.S.C. § 1101(a)(13)(A). Congress expressly excluded humanitarian parole from that definition. *Id.* § 1101(a)(13)(B). Section 1182(d)(5)(A), which authorized Petitioner's parole, provides:

> The Secretary of Homeland Security may . . . parole into the United States temporarily under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit any alien applying for admission to the United States, but such parole of such alien shall not be regarded as an admission of the alien and when the purposes of such parole shall, in the opinion of the Secretary of Homeland Security, have been served the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States.

8 U.S.C. § 1182(d)(5)(A).

Congress authorized temporary physical presence while withholding admission. Section 1182(d)(5)(A) specifies what happens when humanitarian parole ends: the alien returns to the custody from which he was paroled, and his admission case "shall continue." Parole thus allows the applicant to await an admission decision outside detention. It does not grant admission, cancel the request, or require the Government to start an altogether different process when parole ends. *Jennings v. Rodriguez* describes this same operation under either paragraph of § 1225(b): temporary parole followed by return to the original custody. 583 U.S. 281, 287–88 (2018).

The Supreme Court has held that humanitarian parole leaves an alien legally at the threshold of the United States. In *Leng May Ma v. Barber*, the Court considered whether temporary parole changed an alien's legal status for purposes of relief available to an alien "within the United States." 357 U.S. 185, 187–88 (1958). Relying on § 1182(d)(5)'s language, the Court held that it did not. *Id.* at 188–90 ("[T]he Congress specifically provided that parole 'shall not be regarded as an admission of the alien,' and that after the return to custody the alien's case 'shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States.'"). The Court drew in turn on *Kaplan v. Tod*, which itself held that physical release from immigration custody did not effect an entry even though the alien had lived here for years. 267 U.S. 228, 230–31 (1925).

The Supreme Court recently described the same statutory operation in *Blanche v. Lau*:

> Parole thus allows the Government to pause the inspection at the border and defer it to a later time without having to detain the alien pending a final admissibility decision, as would otherwise be required. §§ 1225(a), (b)(2)(A).

609 U.S. 1, 6 (2026).

*Lau* concerned a returning lawful permanent resident and the criminal-offense exception to the ordinary rule against treating such a resident as seeking admission. *Id.* at 6. Legal-status differences aside, this dictum explains how the statutes at issue here operate together. To wit, § 1182(d)(5)(A) permits the Government to defer inspection that would otherwise require detention under § 1225. And the Tenth Circuit has instructed that

Supreme Court dicta, particularly recent dicta, receive nearly the same weight as the Supreme Court's holdings. *Santillan Quiroz v. Mullin*, 180 F.4th 1226, 1237 n.5 (10th Cir. 2026). The statutory text, *Leng May Ma*, and *Lau* all point to the same conclusion: humanitarian parole postpones the admission decision.[6]

Other district courts have read § 1182(d)(5)(A) the same way. In *Fuenmayor v. Mullin*, the district court held that a humanitarian parolee whose parole had lawfully ended was subject to § 1225 despite having lived in the United States for more than two years. 830 F. Supp. 3d 1104, 1105–09 (D.N.M. Apr. 9, 2026), *appeal filed*, No. 26-2063 (10th Cir. Apr. 28, 2026). The court considered both the command to return to custody and the direction that the admission case continue. *Id.* at 1108–09. It concluded that "[§] 1182(d)(5)(A) is more naturally read as rendering parole a means by which Congress either maintains the legal status of the parolee or permits a legal change only while on parole, with a reversion on conclusion." *Id.* at 1109. The court therefore rejected the parolee's claimed entitlement to a bond hearing under § 1226. *Id.*

*Ihor B. v. Regalado* likewise concluded that a parolee could be returned to § 1225(b) custody after DHS terminated his renewed parole by serving an NTA. No. 26-cv-420-JDR-SH, 2026 WL 2043198, at *6–7 (N.D. Okla. July 15, 2026). The court

---

[6] *Santillan Quiroz*'s rejection of the deeming-clause argument advanced by the dissents from the Sixth and Eleventh Circuit panel decisions also points at this, although without resolving it given the differing facts. 180 F.4th at 1242–44. Those dissents argued that § 1225(a)(1) deemed an applicant for admission to possess the ordinary attributes of an applicant, so that legally applying is also legally seeking. *Id.* at 1242. *Santillan Quiroz* rejected that inference, distinguishing *Leng May Ma* and *Kaplan* because those decisions did not involve a deeming provision, instead turning on the legal import of an alien's parole. *Id.* at 1243.

explained: "Plainly, if Petitioner was initially paroled into the United States after being detained under § 1225(b), that is the custody he 'shall be returned to' upon termination of his parole." *Id.* at *7. The court reasoned that detention under § 1225(b) would then continue pending the conclusion of the removal proceeding. *Id.*

For these reasons, no tension arises with *Santillan Quiroz*'s clear requirement for a separate showing that an applicant is "seeking admission" and "at the border" under § 1225(b)(2)(A). 180 F.4th at 1237–40. The petitioner in *Santillan Quiroz* entered without inspection and was arrested in the interior years after entry. Although he was "present" without "admission," § 1225(a)(1)'s "deem[ing]" him an "applicant for admission" did not also deem him to be "seeking admission." *Id.* at 1242–44.[7]

Unlike the petitioner in *Santillan Quiroz*, Petitioner here presented himself at an airport for inspection and received humanitarian parole instead of admission. [Doc. No. 1 ¶¶ 21–22]; [Doc. No. 1-1 at 12, 15]. Petitioner's request for admission preceded physical presence in the interior. Section 1182(d)(5)(A) allowed him to await the decision here in the country without treating that permission as the decision itself. And *Santillan Quiroz* itself recognizes this principle, noting that an applicant continues seeking admission while a request already made remains pending—he does not need to repeatedly fill out a

[7] This was so, the court reasoned, because § 1225(a)(1)'s "deem[ing]" clause functions as a *defining* provision: it defines an "applicant for admission" *as* "[a]n alien present in the United States who has not been admitted or who arrives." *Santillan Quiroz*, 180 F.4th at 1238 (quoting 8 U.S.C. § 1225(a)(1)). Under *Santillan Quiroz*, because "applicant for admission" is thus a term of art, it can't also *give* meaning to those persons so "deemed," unlike a deeming clause that creates a legal fiction. *Id.* at 1243.

form or speak to an officer. 180 F.4th at 1238 ("It is enough that some pending request for admission remains open or ongoing because that indicates the process of securing admission is still active.").

**B. Section 1225(b) requires detention during Petitioner's removal proceedings.**

As explained, Petitioner's humanitarian parole under § 1182(d)(5)(A) left his admission request pending and directed his return to custody when that parole ended. Section 1225(b) mandates Petitioner's detention while that admission request is resolved. The Court proceeds to explain why it need not decide *which* paragraph of § 1225(b) governs this particular case, despite Respondents' contention that § 1225(b)(1)(A)(i) supplies the relevant detention authority. [Doc. No. 7 at 1–2].

First, *Jennings v. Rodriguez* holds that both paragraphs of § 1225(b) require detention throughout the applicable proceedings, subject *only* to humanitarian parole. 583 U.S. 281, 302 (2018) ("§§ 1225(b)(1) and (b)(2) mandate detention of aliens throughout the completion of applicable proceedings and not just until the moment those proceedings begin.").

Second, mere eligibility for expedited removal under § 1225(b)(1)(A) does not foreclose referral of the alien to a full hearing under 8 U.S.C. § 1229a. Although § 1225(b)(1)(A)(i) states that the officer in question "shall order the alien removed," the context of this provision counsels against a mandatory reading that precludes referral to a full hearing. This counterintuitive reading arises from prosecutorial discretion: although myriad criminal statutes use "shall" language, the Supreme Court has repeatedly held that

the word "shall" does not dictate the charges that a prosecutor must bring upon a given evidentiary showing. *United States v. Batchelder*, 442 U.S. 114, 124 (1979) (observing, in the context of criminal statutes using "shall," that "[w]hether to prosecute and what charge to file" still "generally rest[s] in the prosecutor's discretion"); *United States v. Armstrong*, 517 U.S. 456, 464 (1996) (holding in relevant part that executive officials charged by statute to assist the President in "tak[ing] Care that the Laws be faithfully executed" must be afforded significant discretion in fulfilling this mandate (quoting U.S. Const. art. II, § 3)).

Based on that precedent, the Board of Immigration Appeals ("BIA") reached the same conclusion, finding "no reason to suppose that the broad discretion given to the Executive Branch regarding charging decisions in the criminal context does not also apply to . . . DHS[] in the immigration context." *Matter of E-R-M- & L-R-M-*, 25 I. & N. Dec. 520, 523 (B.I.A. 2011). The Court finds *E-R-M-*'s reasoning persuasive here.

This prosecutorial discretion also resolves any tension raised by § 1225(b)(2)(B)(ii)'s prohibition on applying (b)(2)(A) to "an alien . . . to whom [(b)](1) applies." The BIA in *E-R-M-* correctly noted that the absence of a right to full proceedings is not a prohibition on providing them, meaning that the discretionary provision of additional process in the form of a hearing under § 1229a does not indicate that detention authority has moved to either § 1225(b)(2)(A) or § 1226(a). *Id.* at 523–24. And the BIA reached this holding by reference to Congress's separate, express prohibition for stowaways in § 1225(a)(2), which would be unnecessary if

§ 1225(b)(2)(B) already prohibited full proceedings for every excluded category. *Id.* This, too, the Court finds persuasive.

Given the ambiguity of the record surrounding the legal means Respondents may or may not have used at the time of Petitioner's entry, the above construction makes a firm determination unnecessary. For this case, it is enough to conclude that the NTA does not establish that § 1226(a) governs. [Doc. No. 7-1 at 1]. The NTA simply refers Petitioner's case for proceedings under § 1229a. *Id.* While § 1225(b)(2)(A) requires that proceeding for applicants within its scope, nothing about § 1225(b)(2)(A) suggests that it forbids discretionary referral to § 1229a proceedings within § 1225(b)(1) detention.

In sum, § 1225(b) supplies the proper detention authority. Section 1182(d)(5)(A) left Petitioner's admission request pending and directed his return to custody when parole ended. Now, § 1225(b) requires detention during his non-final proceeding.[8] Petitioner is not statutorily entitled to a bond hearing.

### C. Petitioner's arguments on termination notice, changed circumstances, and errors in paperwork do not establish a right to release.

Petitioner also raises several ancillary arguments regarding procedure, timing, and paperwork errors. None establish presently illegal custody.

First, Petitioner argues that his parole remained valid because its expiration date had not arrived and he received no termination notice before his arrest. [Doc. No. 1 ¶¶ 22,

[8] The Court does not rely on § 1182(d)(5)(A) as an independent authorization for continued detention. *See Clark v. Martinez*, 543 U.S. 371, 385–86 (2005). *Clark* required application of § 1231(a)(6) at the post-removal-period stage. Here, § 1225(b) supplies the detention authority while the removal proceedings are not yet final.

30–31, 39, 52]. While the October 5, 2026, expiration date set the parole grant's maximum duration, it did not make the grant irrevocable. Section 1182(d)(5)(A) explicitly permits return to custody based on the discretionary determination that the parole's purpose has been served. The implementing regulation says the same thing. 8 C.F.R. § 212.5(e)(2)(i).

Further, that regulation specifies that service of a charging document constitutes written notice of termination. *Id.* The NTA's certificate of service establishes receipt on June 18, 2026. [Doc. No. 7-1 at 3]. As pointed out by the parties, the dates of NTA service and warrant service suggest a day interval between the arrest and date of service. *Compare* [Doc. No. 7-1 at 3], *with* [Doc. No. 7-2 at 1]. However, the continuation page, which is part of the NTA, *see* [Doc. No. 7-1 at 1], is dated the same date as the arrest. *See* [Doc. No. 7-1 at 4] (continuation page dated 06/17/2026). Regardless, Petitioner seeks release from his *present* custody and an order governing his future liberty—he does not seek compensation for his detention on June 17, 2026.[9] Even assuming for the sake of argument that his parole remained effective until NTA service on June 18, *cf.* [Doc. No. 7-1 at 4], it had terminated before he filed this action on July 2. The absence of earlier notice does not require release from custody that had acquired a lawful basis before the Petition was filed.

---

[9] Potential harm from Petitioner's June 17 detention may (or may not) be the proper subject of a civil rights claim, but that bears no relation to the core habeas remedy of release from present unlawful custody.

Petitioner also argues that, even if the NTA supplied notice, Respondents have not shown that an authorized official made the determination required to terminate parole. [Doc. No. 8 at 5–7]. Section 212.5(e)(2)(i) requires a basis for termination as well as written notice. It permits termination upon accomplishment of the purpose of parole or when an official authorized under section 212.5(a) determines that neither humanitarian reasons nor public benefit warrants the alien's continued presence. But section 212.5 does not require a separate decision form, written findings, or service of a separate document stating that the determination has been made. In fact, it expressly permits the charging document to supply written notice. 8 C.F.R. § 212.5(e)(2)(i). The absence of a separate written determination does not establish that DHS failed to make the required determination, and the presumption of regularity supports the opposite conclusion.[10]

Moreover, no indication exists that the Assistant Field Office Director did not have the delegated authority or proper function to issue the NTA. Instead, this Court presumes that the Government officials properly discharged their official duties. *See United States v. Armstrong*, 517 U.S. 456, 464 (1996) ("[I]n the absence of clear evidence to the contrary, courts presume that [Government agents] have properly discharged their official duties."); *United States v. Chem. Found., Inc.*, 272 U.S. 1, 14–15 (1926) ("The presumption of regularity supports the official acts of public officers and, in the absence

[10] This Court is not the first to apply such a presumption regarding the required determination: the district court in *Ihor B. v. Regalado* explained that a charging document "presumptively terminates parole because an intent to remove a noncitizen necessarily reflects a determination that the continued presence of that individual is no longer warranted." No. 26-cv-420-JDR-SH, 2026 WL 2043198, at *6 (N.D. Okla. July 15, 2026) (quoting *Matter of Arambula-Bravo*, 28 I. & N. Dec. 388, 395 (B.I.A. 2021)).

of clear evidence to the contrary, courts presume that they have properly discharged their official duties."); *Perlmutter v. Comm'r Internal Revenue*, 373 F.2d 45, 46 (10th Cir. 1967) (holding that "[a] presumption of official regularity attaches in situations" where delegation is permissible and not disclaimed by the relevant authority); *see also Coreas v. Holder*, 526 F. App'x 322, 326 (4th Cir. 2013) (unpublished) (upholding a presumption of regularity where a "group supervisor" issued an NTA, even though that title did not appear in 8 C.F.R. § 239.1(a)).

Here, DHS issued and served an NTA charging Petitioner with lacking the required immigrant visa. [Doc. No. 7-1 at 1, 3–4]. The Court presumes that DHS made the determination required by section 212.5(e)(2)(i) before serving that notice.

The errors Petitioner identifies in the arrest record do not show that DHS failed to make a parole-termination determination. [Doc. No. 8 at 7–11]. Nor does his unexpired parole re-approval indicate that DHS could not later terminate parole under section 212.5(e)(2)(i). The immigration record is not error-free,[11] and certainly an NTA isn't irrebuttable proof of every allegation it contains. But on this record, the absence of a

[11] Petitioner identifies paperwork errors, including inaccurate statements concerning his nationality (Ukraine versus Georgia), his family, whether he possessed a passport, and his pending I-131 and I-130 applications. [Doc. No. 8 at 7–11]; *cf.* [Doc. No. 7-3 at 3] (stating Petitioner did possess an unexpired Georgian passport). Petitioner's frustration is understandable. But whether Petitioner had a passport says nothing about whether Petitioner also held the visa he is charged as having lacked. Petitioner himself admits he obtained initial travel authorization and humanitarian parole, not admission via an immigrant visa. [Doc. No. 8 at 2–5]. His parole approvals confirm this too. [Doc. No. 1-1 at 12, 15]. Correcting these errors would not change DHS's ability to revoke his parole or detain him. And the discretionary nature of humanitarian parole means that Petitioner may raise these paperwork errors with DHS at any time in support of restoring his prior parole.

separate written termination finding does not overcome the presumption that DHS completed the procedure required to terminate parole.

Finally, Petitioner's changed-circumstances argument invokes the wrong parole provision. He relies on 8 C.F.R. § 236.1(c) to argue that the Government needed a new individualized justification for detention after release. [Doc. No. 1 ¶¶ 56–59]. But that regulation governs custody and release under § 1226. Petitioner received humanitarian parole under § 1182(d)(5)(A), subject to termination under section 212.5(e). These are distinct forms of release, *see Jennings*, 583 U.S. at 288, 300–03, 306, and their implementing regulations do not cross-apply.

**D. The Constitution does not require the additional custody hearing Petitioner seeks.**

Petitioner also claims a constitutional right to notice and an individualized hearing before redetention, or at least a prompt hearing afterward. He relies on his years of authorized residence and earlier release on parole, and he asserts that this right exists even if § 1225 governs. [Doc. No. 1 ¶¶ 47–55, 60–63]; [Doc. No. 8 at 12–15].[12]

"As a general matter, '[b]ecause aliens do not have a constitutional right to enter or remain in the United States, the only protections afforded are the minimal procedural due process rights for an opportunity to be heard at a meaningful time and in a

[12] The Petition does not invoke due process based on prolonged detention. *See generally* [Doc. No. 1 ¶¶ 60–63]. However, even if it did—and putting aside questions of the applicability of length considerations to a pre-adjudicative posture—Petitioner's current period of detention would fall short of the standard articulated in *Zadvydas v. Davis*, 533 U.S. 678, 701 (2001), which presented in the more constitutionally fraught setting of potentially indefinite detention.

meaningful manner.'" *Igiebor v. Barr*, 981 F.3d 1123, 1134 (10th Cir. 2020) (quoting *Arambula-Medina v. Holder*, 572 F.3d 824, 828 (10th Cir. 2009)). Here, Petitioner receives that right to be heard in the form of his removal hearing under 8 U.S.C. § 1229a. Petitioner provides no case law suggesting that, under 8 U.S.C. § 1182(d)(5)(A), this right to be heard must be provided before detention.

The Supreme Court's treatment of parole further forecloses the premise that Petitioner's physical presence placed him in the same constitutional position as someone who had effected an entry. In *Department of Homeland Security v. Thuraissigiam*, the Court explained: "On the contrary, aliens who arrive at ports of entry—even those paroled elsewhere in the country for years pending removal—are 'treated' for due process purposes 'as if stopped at the border.'" 591 U.S. 103, 139 (2020) (quoting *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 215 (1953)). The Court reiterated that "'[w]hatever the procedure authorized by Congress is, it is due process as far as an alien denied entry is concerned.'" *Id.* (quoting *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 544 (1950)).

The Supreme Court in *Jennings* also foreclosed importation of a six-month bond requirement to 8 U.S.C. § 1225(b) under constitutional avoidance. There, the Supreme Court called *Zadvydas v. Davis*, 533 U.S. 678 (2001), "a notably generous application of the constitutional-avoidance canon," and expressly rejected extending its constitutional avoidance construction to § 1225(b). *Jennings*, 583 U.S. at 299–301 (distinguishing the discretionary versus mandatory detention language between 8 U.S.C. §§ 1225 and 1231).

Instead, Petitioner fits *Thuraissigiam*'s circumstances precisely: he "arrive[d] at [a] port[] of entry" and was "paroled elsewhere in the country for years pending removal" and so he is "'treated' for due process purposes 'as if stopped at the border.'" 591 U.S. at 139 (quoting *Mezei*, 345 U.S. at 215). Congress does not prescribe an individualized bond hearing, and so Petitioner's due process rights have not been violated. The Tenth Circuit has held similarly—that a parolee's lengthy physical presence does not create a constitutional entitlement to immigration parole. *Sierra v. INS*, 258 F.3d 1213, 1218 (10th Cir. 2001).

Petitioner cites *Sanchez v. LaRose*, No. 25-cv-2396-JES-MMP, 2025 WL 2770629, at *2–4 (S.D. Cal. Sept. 26, 2025), which reasoned that a prior parole grant created a protected liberty interest requiring additional process before parole termination. [Doc. No. 1 ¶ 49]. The Court finds no persuasive value in *Sanchez*'s reasoning, as applying it would plainly violate the rules and statutes set out above.

Petitioner further argues that detention serves no legitimate purpose without an individualized finding of danger or flight risk, given his compliance, family circumstances, and employment. [Doc. No. 1 ¶¶ 61–63]. Congress has disagreed, deciding that applicants for admission subject to § 1225(b) must be detained to give "immigration officials time to determine an alien's status without running the risk of the alien's either absconding or engaging in criminal activity before a final decision can be made." *Jennings*, 583 U.S. at 286.

Petitioner's humanitarian parole was, from the very start, a temporary dispensation of Executive and congressional grace—one that could be quickly revoked in summary

fashion once its humanitarian purpose had been served. The Due Process Clause does not require a separate finding of danger or flight risk before DHS may return him to the detention attendant to an arriving alien.

## IV. CONCLUSION

For these reasons, the Court DENIES Petitioner's Petition for Writ of Habeas Corpus [Doc. No. 1]. The Court DENIES Petitioner's separate Motion to Expedite [Doc. No. 9] as moot. Petitioner's Supplements to the Motion to Expedite, to the extent they are distinct motions requesting relief, are further DENIED as moot. [Doc. Nos. 11, 12]. A separate judgment will follow.

IT IS SO ORDERED this 29th day of September 2026.

JODI W. DISHMAN
UNITED STATES DISTRICT JUDGE